## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **DANIEL HEWITT and LYNNE THOMPSON, individually and on behalf of all others similarly situated,** )<br><br>**Plaintiffs,** )<br><br>v. )<br><br>**CAPITAL ONE, N.A., and INSPIRA FINANCIAL TRUST LLC,** )<br><br>**Defendants.** ) | **CASE NO. 24-CV-4839**<br><br>**JURY TRIAL REQUESTED** |

## CLASS ACTION COMPLAINT

Plaintiffs Daniel Hewitt ("Hewitt") and Lynne Thompson ("Thompson") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their counsel, bring this Class Action Complaint ("Complaint") against Defendants Capital One, N.A. ("Capital One") and Inspira Financial Trust LLC ("Inspira"), formerly known as Millennium Trust Company ("Millennium") (collectively "Defendants"), based upon personal knowledge with respect to themselves, and on information and belief and the investigation of counsel as to all other matters, and in support thereof allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action on behalf of themselves and all other persons in the United States who were owners of a Capital One IRA account transferred by Capital One to Millennium.

2.      Capital One historically paid high interest rates to individual retirement account ("IRA") investors, like Plaintiffs, whose IRA cash savings were invested in high yield cash savings products such as high yield savings accounts and certificates of deposits ("CDs").  Capital One was the IRA custodian for those accounts.

3.      Capital One had from January 2018 through September 30, 2019, paid 1.0% APY (annual percentage yield) interest on Plaintiffs' IRA cash savings.  Even in the low interest rate environment of late 2021 through June 2022 (and after deciding to exit the IRA business) Capital One paid 0.40% APY. Capital One paid even higher yields on available IRA CDs.

4.      From January 1, 2022 through May 2023, the federal funds rate increased rapidly from 0.08% to 5.06%, and Capital One increased the rate paid on its benchmark 360 Performance Savings account to 3.75%.  Capital One currently (as of May 15, 2024) pays 4.25% APY on its 360 Performance Savings Account (which Capital One states is "one of the nation's top savings interest rates") and 5.00% APY (as of May 15, 2024) on one year CDs.

5.      Beginning in or around 2021, Capital One notified Plaintiffs (separately) and other members of the Class that Capital One would be resigning as IRA custodian and

planned to transfer their IRA accounts to Millennium, which would become the successor custodian.

6.      Plaintiffs were "invite[d] … [by Millennium in emails] to get set up and log in as a 'New User' to explore the wide array of investment choices available[]" at Millennium.

7.      Millennium was, however, a dramatically inappropriate choice as successor custodian for the Capital One IRA accounts.  Unlike Capital One, Millennium is not a bank and does not offer high-yield cash savings products.  Nor is Millennium a brokerage firm.

8.      Rather, Millennium is a trust that "sweeps" IRA cash to third party banks that pay Millennium interest on those sweep amounts. Millennium then pays itself "compensation" from the swept interest before crediting meager amounts (below 0.10% APY) to investors on their IRA cash savings.

9.      Further, Millennium charges additional annual and transaction fees that had not been charged at Capital One, and that exceed the yield paid by Millennium to investors on an annual basis.

10.     Although Capital One had the contractual right to designate a successor custodian, it was obligated to do so in good faith.  Capital One failed to exercise good faith when it selected Millennium as successor custodian rather than a bank or brokerage firm that would continue to pay Plaintiffs and other members of the Class the high yields Capital One had paid.

11.     Capital One was financially motivated when it transferred the IRA accounts to Millennium. The ability to serve as custodian and manage IRA funds is a valuable

commodity, especially for Millennium because it keeps most of the "sweeps" interest for itself and pays low yields.

12.     On information and belief, Millennium paid Capital One valuable consideration for the right to serve as successor custodian and manage Class members' IRA accounts.  Capital One accordingly had a conflict of interest that it failed to remedy or disclose to investors prior to the transfer of their accounts.  Instead, Capital One simply advised Class members that Millennium was chosen as the successor custodian, without disclosing to Class members its financial interest in the transaction, and without taking steps to ensure that its customers would continue to receive high yields on their IRA cash savings, or otherwise not be disadvantaged as a result of the transfer to Millennium.

13.     The transfer to Millennium impaired consumers' ability to save for retirement, thus undermining the very purpose of an IRA.  Plaintiffs and other members of the Class incurred damages in an amount equal to the difference between what they would have been paid by a successor custodian that paid a competitive high yield similar to Capital One, and what they were actually paid by Millennium.

14.     Millennium acted dishonestly and unfairly, and was unjustly enriched, by sweeping customer cash to banks, pocketing the lion's share of the interest paid by those banks as "compensation" and assessing excessive fees, and then paying Plaintiffs and other members of the Class yields that were neither "competitive" nor "based on the interest rate environment" as promised in the Millennium IRA Agreement.

## THE PARTIES

15.     Plaintiff Hewitt is domiciled in the State of New Jersey.  Hewitt had been a Capital One Traditional IRA accountholder since at least 2016.  On or about June 13, 2022, Capital One resigned as the custodian of Hewitt's IRA and appointed Millennium as the new custodian of his account.

16.     Plaintiff Thompson is domiciled in the State of North Dakota. Thompson has been a Capital One Traditional IRA account holder since at least January 2016.  On or about January 24, 2022, Capital One resigned as the custodian of Thompson's IRA and appointed Millennium as the new custodian of her account.

17.     Defendant Capital One, N.A. is a national bank with its principal place of business in McLean, Virginia.  Defendant Capital One, N.A. is a wholly-owned subsidiary of Capital One Financial Corporation.

18.     Defendant Inspira Financial Trust LLC (formerly known as Millennium Trust Company) is a business trust and an IRA custodian with its principal place of business in Oak Brook, Illinois.  Neither Millennium nor Inspira is a bank or a licensed broker-dealer.  All references to Millennium herein are inclusive of conduct after the name change.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d).  This matter is brought as a class action pursuant to Fed. R. Civ. P. 23, the proposed Class includes thousands of members, the Class contains at least one member of diverse citizenship from one defendant, and the aggregate amount in controversy exceeds five million dollars excluding interest and costs.

20.     Personal jurisdiction and venue are proper in Illinois within this District because Inspira Financial Trust LLC is a corporation licensed and authorized to do business in Illinois and regularly transacts business in Illinois.  This Court has personal jurisdiction over Capital One because Capital One regularly transacts business in Illinois, including by entering into an agreement to transfer, and transferring, all of its customers' IRA accounts to Millennium, which is headquartered in Illinois.

21.     Millennium's IRA Agreement (Article XXIV) provides that "[a]ny controversies, claims, counterclaims, crossclaims, or disputes arising out of or in any way related to this Agreement or the [investor's] Account … shall be governed by the laws of the State of Illinois…."

## FACTUAL ALLEGATIONS

### A.     Plaintiffs' IRA Accounts with Capital One

22.     Congress created IRAs in the Employee Retirement Security Act of 1974 to provide individuals with a retirement savings vehicle.  Funds deposited in traditional IRAs are tax-deductible.   Additionally, traditional IRAs defer tax payments on investment growth and interest accrued by the funds deposited in the IRA account.

23.     Over time, Congress has created different forms of IRAs, including Roth and Simplified Employee Pension Plan (SEP) IRAs.  Although those IRAs have different attributes than Traditional IRAs, they similarly encourage long-term retirement investment.

24.     Over time, what may appear to be a relatively small difference in interest payments, compounded at least monthly, will result in a material difference in retirement savings.

25.     All forms of IRAs are included in this Class Action.

26.     As a matter of law, every IRA requires the designation of a custodian.  An IRA custodian is a financial institution that holds an account's investments for safekeeping and ensures that all Internal Revenue Service and government regulations are followed.

27.     Capital One is a wholly owned subsidiary of Capital One Financial Corp. ("COFC").  COFC is a publicly owned corporation, which is regulated by the Securities and Exchange Commission (SEC) and files publicly available financial statements with the SEC.

28.     According to COFC's Form 10-K filed with the SEC for 2023, COFC and its subsidiaries, including Capital One, "are subject to extensive regulation and supervision. In addition to banking laws and regulations … [w]e and our subsidiaries are also subject to supervision and examination by multiple regulators. In addition to laws and regulations, state and federal bank regulatory agencies may issue policy statements, interpretive letters and similar written guidance applicable to us and our subsidiaries." *Id.* at 7.

29.     Until 2022, Capital One actively marketed IRA savings accounts to investors who preferred to maintain at least portions of their IRAs in cash.  Capital One advertised and paid competitive, high yields on IRA savings accounts.

30.     Capital One advertised its savings accounts as paying "high interest" and a "great rate."

31.     Capital One encouraged customers to keep money in high-yield savings accounts for extended periods of time, saying on its website: "Once you deposit your money and keep it in the account, the interest alone will help your savings grow." Capital One's website further advised: "A high-yield savings account can be a safe place to park your hard-earned cash....  There are some common things you can do to help your savings grow faster: Put your money into a high-interest savings account and leave it in there to earn interest."[1]

32.     Online savings accounts, as a category, offer significantly higher interest rates than physical branch savings accounts.  As Capital One says: "One benefit of most online banks is that they usually don't have the same costs as physical locations. Because of that, they might be able to pass some of their savings to you with lower fees and higher interest savings rates on your deposits....  A big difference between online savings vs. traditional savings accounts is how much interest you can earn. Online banks often offer higher interest rates on savings accounts than traditional banks."[2]  Consequently, the term "high interest" or "high yield," when applied to an online savings account, is understood to mean that the interest rate is competitive with other online savings accounts.

33.     Beginning in 2019, Capital One began to offer as its primary online savings account the 360 Performance Savings Account, which paid a competitive yield.

---

[1] https://www.capitalone.com/bank/money-management/banking-basics/what-is-a-high-yield-savings-account/ (dated April 13, 2022; last accessed June 5, 2024).

[2] https://www.capitalone.com/bank/money-management/banking-basics/online-banking-vs-traditional-banking/ (dated March 16, 2022; last accessed June 5, 2024).

34.     As of May 15, 2024, Capital One paid 4.25% APY on its 360 Performance Savings Account and 5.00% APY on one-year CDs.

35.     Capital One, because it is a bank and not a brokerage firm, does not execute trades in securities for clients.  Rather, it invests customer cash in savings accounts or certificates of deposit.

36.     IRA investors who chose to do business with Capital One made a conscious decision to do business with a bank that pays high yields on cash.

**B.      Capital One Resigns as Custodian of Plaintiffs' IRAs
and Designates Millennium as Successor Custodian**

37.     For several years, both Thompson and Hewitt had IRA accounts with Capital One as their custodian.

38.     From at least December 2018 through September 2019, Plaintiffs were paid 1.00% annual interest on their Capital One IRAs.  Even in the lower yielding COVID environment in late 2021, when the federal funds target rate was 0.00 to 0.25%, Capital One paid Hewitt and Thompson 0.40% on their IRA cash.

39.     Thompson and Hewitt were drawn to Capital One because it paid a competitive high yield rate of interest on cash in IRAs, and as a bank it was FDIC insured.

40.      Prior to January 2022, Thompson received a notification from Capital One that it was resigning as her IRA custodian and had selected Millennium as the successor custodian of her IRA.

41.     Subsequently, Hewitt received the same or similar notification from Capital One advising that Capital One was resigning as Hewitt's IRA custodian and had selected Millennium as the successor custodian of his IRA.

42.     Under its Capital One Individual Customer Account Agreement with customers ("Capital One IRA Agreement"), Capital One had the right to resign as custodian and the discretion to designate a successor custodian (¶ 8.09, dated 2017), but as with any agreement under Virginia law, that discretion was subject to the covenant of good faith and fair dealing.

43.     In connection with discussions prior to the filing of this Complaint, Capital One provided Plaintiffs with a copy of correspondence sent by Capital One to Hewitt prior to transferring his IRA account to Millennium.  While Plaintiffs no longer had copies of that correspondence in their possession, Plaintiffs acknowledge that they both were likely to have received copies of that notice.

44.     The correspondence provided by Capital One (dated April 13, 2022 with respect to Hewitt) stated that "Capital One has planned for Millennium Trust – one of the largest independent IRA custodians – to serve as the successor custodian of your IRA, unless you decide otherwise….  At the time of transfer, the money in your IRA will be invested initially in Millennium Trust's FDIC-insured cash sweep program."

45.     Similarly, the letter stated that the maturity value of any CD would be transferred to Millennium.

46.     The correspondence was highly misleading because it failed to disclose that Millennium was neither a bank, and therefore Plaintiffs' deposit accounts would not be

protected by FDIC insurance, nor was it a brokerage firm, and therefore was not regulated by the SEC or a member of the Financial Industry Regulatory Authority ("FINRA"), or protected by the Securities Investor Protection Corp. ("SIPC").

47.     Among other things, FINRA bars member organizations from compelling investors to agree to arbitration of class claims (*see* FINRA Rule 12204), and the Capital One IRA Agreement did not have a compulsory arbitration clause. Capital One failed to disclose to investors that by transferring their accounts to Millennium, investors could become subject to an arbitration clause that was designed to forfeit customers' rights to participate in a class action.

48.     Moreover, Millennium, as a trust, could not invest Plaintiffs' cash in loans or other assets or pay interest directly to investors on deposits.

49.      Rather, in a complex transaction, Millennium would "sweep" investor cash to a third-party bank, which would invest that cash and pay Millennium a "Bank Rate." Millennium would then apply a "Crediting Rate," pay itself compensation, and charge additional fees so that it paid Plaintiffs and other members of the Class yields that were both substantially less than the "Bank Rate" and the rates that had been paid by Capital One.

50.     None of this was explained by Capital One to IRA accountholders. Plaintiffs and other members of the Class, accordingly, were defaulted into Millennium's low yield sweep accounts after the transfer from Capital One.

51.     To Plaintiffs, who relied on Capital One's good faith, this was a black box.  Rather, Plaintiffs assumed that they would be paid interest on their deposits at a rate and in a manner consistent with Capital One's high yields.

52.     Certainly, nothing in the communications from Capital One or Millennium disclosed that the default rate on customer cash with Millennium would be substantially lower than the rate that had been paid by Capital One.

53.     Moreover, the Capital One correspondence misrepresented that Millennium was "one of the largest independent IRA custodians."  In fact, Millennium, because it is neither a bank nor brokerage firm, specializes in niche "self-directed" IRAs, where the owner of the account invests in non-securities assets, such as real estate or other "alternative" assets.  Inspira's current website promotes investments in alternative assets:

> "Alternative assets — like real estate, private equity, hedge funds, and more — can help you diversify your portfolio. The network gives you an easier way to research and access alternative investments."

> https://inspirafinancial.com/individual/retirement-wealth/self-directed-ira/investment-network  (last viewed June 5, 2024).

54.     Millennium is not a traditional IRA custodian in the same sense as was Capital One or Fidelity, Vanguard, and Schwab, or any number of other traditional IRA custodians to which Capital One could have transferred the Plaintiffs' IRA accounts.

55.     Millennium on December 9, 2021, emailed Thompson with respect to the account transfer from Capital One.[3]  The "Subject" on the email stated "We will help you

---

[3] The December 9, 2021 email was provided to Thompson in connection with discussions prior to the filing of this Complaint.  Thompson did not have a copy of the December 9, 2021 email in her possession.

save and invest with confidence." The body of the email added "If you choose us, you will gain a dedicated and caring team, backed by decades of experience, to assist with this transition and to support your savings and investing journey."

56.     Investors were further "invite[d]" to "set up and log in to the MTC Investment Platform to view the wide array of investment choices you would have as our client."

57.     Pursuant to a form email from Millennium dated May 27, 2022, Hewitt was similarly "invite[d] … [by Millennium] to get set up and log in as a 'New User' to explore the wide array of investment choices available" at Millennium. That email stated in large block letters – "You will have a trusted ally on your savings and investing journey…. If you choose Millennium Trust as your custodian, you'll gain a dedicated and caring team, backed by decades of experience to support your savings and investing journey."[4]

58.     Hewitt received a second form email dated June 17, 2022 from Millennium stating that "Your Capital One IRA has moved." "The move is complete and your Capital One IRA has been securely transferred to Millennium Trust." "Your money is secure, earning interest and FDIC-insured until you're ready to invest."[5]

59.     Nothing in the May or June 2022 emails alerted Hewitt or other members of the Class (including Thompson, who had earlier received similar emails) that Millennium

---

[4] Thompson assumes but does not recall that she received that same email although most likely on an earlier date.

[5] Thompson assumes but does not recall that she received that same email although most likely on an earlier date.

was not a bank and could not invest or pay customer cash directly, or that Millennium would pay substantially lower yields than Capital One.

60.     Millennium did not offer a "wide array of investment choices," and did not offer the investment choice most desired by Plaintiffs – a high yield FDIC–insured savings account.

61.     Millennium has among the lowest ratings by the Better Business Bureau ("BBB") imaginable.[6] As of May 15, 2024, Millennium's reviews on the BBB website averaged 1.08 out of 5 based on 130 customer reviews.

62.     With respect to Capital One specifically, Hwa L wrote on the BBB website on April 18, 2023 that:

> Like many others, we have had difficulty getting an *** account transferred out of Millennium Trust. We called them and had a broker send in a transfer form, as the customer service rep said we should do. ********************** signed for the form on 2 February, 2023, and the broker heard nothing from them. It is now 18 April, and Millennium has done nothing but refer us to their customer "service." Note: they asked us to review them on TrustPilot, but that site gives then 4* - a major discrepancy from 1* here. They shouldn't have a good BBB rating! Note further. The *** account is worth less than the initial contribution, after Millennium deducted fees - and we never agreed to permit CapitalOne transfer the account. Millennium is a bad actor, and regulators should do something about them! They deserve a 0* rating!

63.     And Joanne L wrote on January 24, 2024 that:

> SCAM! I had $114.98 in a CapitalOne Account *** that I was unable to remove when I closed all my accounts - I tried. They moved it to Inspira - who charged me $35 in an annual fee and $10 for a paper statement - I didn't even know Inspira had my account. What a scam.

---

[6] https://www.bbb.org/us/il/oak-brook/profile/trust-company/millennium-trust-company-llc-0654-33001550/customer-reviews (last viewed June 5, 2024).

64.     Thompson's IRA account was transferred to Millennium by Capital One effective January 24, 2022.  Thompson's account balance on the date of transfer was $105,592.09.

65.     Hewitt's IRA account was transferred to Millennium by Capital One effective June 13, 2022.  Hewitt's account balance on the date of transfer was $15,415.69.

### C.     Millennium Defaulted Former Capital One Customers Into Lower-Yielding Sweep Accounts

66.     Although neither Thompson nor Hewitt have any recollection of opening or reviewing any of the account documents on Millennium's website, to access their IRA accounts they had no choice but to sign into a Millennium Trust account.

67.     Among the account documents that Plaintiffs assume they were forced to consent to on the Millennium website was a two-page, two-column, single spaced, small-print document entitled Traditional IRA Disclosure Statement; a seven-page, two-column, single-spaced, small-print document entitled Traditional IRA Custodial Agreement (Millennium IRA Agreement); and a two-page Privacy Notice.

68.     Because Millennium was neither a bank nor a brokerage firm, Millennium arranged for the customer cash transferred from Capital One to be invested in sweep accounts.  Investors in brokerage retirement accounts routinely maintain some cash in brokerage accounts.  Broker-dealers however are prohibited by SEC regulations from investing customer cash for use in their brokerage businesses.  Therefore, as a necessary accompaniment to brokerage accounts, sweep arrangements allow brokers to "sweep" cash in brokerage accounts to banks for use in the banks' businesses.

69.     Banks customarily pay the broker interest for use of that cash and the broker in turn remits that interest to its customers, taking a moderate fee of its service as a necessary accompaniment to the brokerage account.

70.     Given the two-party nature of a sweep account (involving a brokerage firm and an FDIC-insured bank account), FDIC-insured sweep accounts traditionally pay lower interest than FDIC-insured savings accounts.  Thus, for example, as of May 15, 2024, Fidelity Investments, paid 2.79% APY on swept cash compared to the 4.25% APY Capital One paid on its 360 Performance Savings Account.

71.     The Millennium IRA Agreement is in significantly smaller print than other documents on Millennium's website, such as the Privacy Notice.

72.     Plaintiffs do not recall reading the Millennium IRA Agreement at or about the time their IRAs were transferred to Millennium, but even if they had, they would not have learned that they would be paid significantly lower yields than on their Capital One accounts.

73.     The Millennium IRA Agreement stated in small print (Article IX; Para. 1; entitled "Cash Sweep Program, Uninvested Funds, Compensation") that cash in the Sweep Program would be placed "in one or more" FDIC-insured, "interest-bearing bank demand accounts … at banks that are not affiliated with" Millennium.

74.     Para. 2 added that should the cash in an account exceed an unspecified "Cap Amount," that cash should be invested in the Federated Government Obligations Fund – Trust Shares "(Federated Fund)".  As of May 15, 2024, the Federated Fund (symbol GORXX) yielded 4.67%.

75.     Many traditional brokerage firms, including Fidelity Investments and Vanguard investments, use money market funds ("MMFs") as their primary sweep option.[7] In 2022-23 Fidelity Investments swept cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investor cash into its Vanguard Federal Money Market Fund (VMFXX).  Both government money markets consist of at least 99.5% U.S. government or agency securities backed by the full faith and credit of the U.S. government.  Both Fidelity and Vanguard government money market funds have minimal risk that is equivalent to FDIC-insured accounts.  *See* 17 C.F.R. 270.2a-7(a)(11).

76.     As of May 15, 2024, SPAXX paid 4.95% (APY) and VMFXX paid 5.27% (APY).[8]  SPAXX and VMFXX are also appropriate benchmarks for the rate Millennium paid to former Capital One IRA customers.

77.     The Fidelity Government Money Market Mutual Fund (SPAXX), which Fidelity employs as a primary sweep account, has a fundamental investment objective to "seek[ ] as high a level of current income as is consistent with preservation of capital and

---

[7] "Fidelity Highlights Benefits of Default Cash Options for Retail Accounts," by David Armstrong, Wealth Management, August 7, 2019, accessed at https://www.wealthmanagement.com/investment/fidelity-highlights-benefits-default-cash-options-retail-accounts (last viewed January 30, 2024); "Fidelity is Giving Customers Higher Rates on Cash. Here's Why.," by Daren Fonda, Barron's, August 9, 2019, p. 3, accessed at https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-merrill-lynch-vanguard-etrade-51565291732 (last viewed January 30, 2024).

[8] https://fundresearch.fidelity.com/mutual-funds/summary/31617H102; https://investor.vanguard.com/investment-products/mutual-funds/profile/vmfxx (last viewed June 5, 2024.

liquidity."[9] The Fidelity MMF is managed by an investment advisor, and is supervised by a Board of Trustees, each with an obligation to ensure that the fund is operated in a manner intended to achieve its fundamental investment objective.

78. The substantially higher yields offered by MMFs as sweep options, along with the rates paid by Capital One on its 360 Performance Savings Account and the rates paid by Fidelity on FDIC-insured sweep accounts, is strong evidence that the yields paid by Millennium on IRA cash are not reasonable or competitive.

79. Article IX, Para. 4 of the Millennium IRA Agreement further stated that "[t]he Crediting Rate [paid to customers] is based on interest on the amounts held in the Bank Accounts at each bank that participates in the Program," and that "[t]he interest rates paid [to Millennium] on each Bank Account [*i.e.,* the "Bank Account interest rates"] is set by each [unaffiliated] bank independently, based on the interest rate environment and competitive market conditions, and will vary over time."

80. The complex jargon in Article IX did not alert Plaintiffs or other members of the Class that they would be paid substantially lower yields by Millenium in the Sweep Program than their high yield Capital One savings account, the Federated Fund, or other minimal risk financial instruments available in the market.

81. Under the Sweep Program, as described in Article IX, Plaintiffs would not be paid directly for the use of their cash by the banks to which Millennium would transfer their cash. Rather, interest on that cash would first be paid to Millennium that then applied

---

[9] The SPAXX Prospectus is available at https://perma.cc/QA98-QP96 (last viewed January 30, 2024).

a "Crediting Rate" to pay itself "compensation for servicing and administering the [Sweep] Program and rendering other services in connection with custody of the Account." Article IX, Para, 4.

82.     Neither the Bank Account interest rates, the "compensation [due Millennium] for services and administering the [Sweep] Program and rendering other services," nor the Crediting Rate were disclosed to depositors upon account opening or in the Millennium IRA Agreement.  Rather, depositors were told that they "may request the current Bank Account interest rates, a list of banks participating in the Program and the Crediting Rate by contacting a Millennium Trust Client Service Representative."

83.     In connection with their preparation of this Complaint, Plaintiffs, by their counsel, sought disclosure from Millennium of current interest rates and a list of banks participating in the sweep program, and were informed in writing in a document entitled "Important Information – FDIC-Insured Cash Account Program – "that as of August 17, 2023 the "Current Net Bank Rate" was 0.43%.

84.     Plaintiffs updated their request on April 19, 2024, and were informed again that the "Current Net Bank Rate" remained at 0.43%.

85.     In contrast, Capital One's high-yield 360 Performance Savings Account paid 3.75% interest as of May 2023 and is currently paying 4.25% in May 2024.

86.     Elsewhere, Millennium represented to investors that the rate paid on cash would be "reasonable."  *See*  https://inspirafinancial.com/individual/resources-education/faqs/wealth-retirement/automatic-rollover-iras ("How is my automatic rollover IRA initially invested?  Your automatic rollover IRA is initially invested in an FDIC-

insured, interest-bearing bank account, or another investment directed by your former employer, which are designed to minimize risk, preserve principal, maintain liquidity and provide a reasonable rate of return….") (last viewed June 5, 2024).

87. In any event, Plaintiffs never received anything close to even 0.43% from Millennium.

88. Moreover, Millennium was not registered as a broker-dealer and was not a member of FINRA or the New York Stock Exchange. Thus, unbeknownst to Plaintiffs and other members of the Class, Millennium was not subject to and did not comply with FINRA, SEC or NYSE rules and regulations.

89. More specifically, Millennium did not provide disclosures that complied with NYSE Information Memo Number ("IM") 05-11, which is applicable to broker-dealers and establishes a standard of care.

90. IM 05-11 requires "member organizations" to "disclose the terms and conditions, … conflicts of interest, current interest rates…." And specifies that "[a]ll such disclosures should be forthright, clear, complete, prominent and unambiguous." IM 05-11 further requires disclosure of "the expected range of such [member organization] compensation, as well as a disclosure of the difference, if any, between the rates of return at the existing money market fund [or in the case of Millennium, the rate that had been paid by Capital One on cash] and the proposed sweep fund."

91. Millennium's disclosures would not have complied with IM 05-11 because they (i) did not disclose its "conflict of interest" in establishing the Crediting Rate, and (ii) did not disclose "the current interest rates" or "the expected range of [its] compensation,"

or the "difference … between the rates" payable by Capital One on online high yield accounts and the sweep rates paid by Millennium. Rather, Millennium burdens depositors with requiring that they "request the current Bank Account interest rates, a list of banks participating in the Program and the Crediting Rate by contacting a Millennium Financial Client Service Representative." And even then, Millennium did not provide accurate information but misrepresented that it paid investors 0.43%.

92.     Thus, although Thompson was being paid 0.40% APY on her cash by Capital One immediately prior to her account being transferred to Millennium, she was only paid $0.77 of interest for her full first month at Millennium (February 2022), for an annual yield of less than .01%.

93.     For the 2022 calendar year (from January 24, 2022 through December 1, 2022), Thompson was paid only $15.39 in interest (equivalent to approximately 0.018% APY). For the entire 2023 calendar year, Thompson was paid only $76.81 in interest (equivalent to approximately 0.077% APY).

94.     For the 2022 calendar year (from June 13, 2022 through December 1, 2022), Hewitt was paid only $1.79 in interest (equivalent to approximately 0.023% APY).

95.     The disclosures made by Capital One and Millennium were insufficient to alert Plaintiffs and other members of the Class that they would be paid significantly lower yields than they had received at Capital One.

96.     Hewitt first recognized the low interest being paid on his account when he reviewed his 2022 annual account statement from Millennium.

97.     Thompson first recognized the low interest being paid on her account when she reviewed her 2023 annual account statement from Millennium.

98.     There existed many other banks and brokerage firms to which Capital One could have transferred accounts that would have paid Class Members a competitive interest rate. Capital One provided no explanation why it had transferred the accounts to a trust that was neither a bank nor a brokerage firm, and that paid rates substantially below Capital One's interest rate and other competitive rates.

99.     Many other IRA custodians were more suitable custodians than Millennium. For example, as of May 15, 2024, American Express (4.25% APY), Ally Bank (4.20% APY), and Discover (4.25% APY), all paid substantially higher rates on IRA Savings Accounts.[10]

100.    Capital One took no measures to ensure that Plaintiffs and other members of the Class would be paid a reasonable or competitive yield on their cash.

101.    Neither Thompson nor Hewitt recall receiving monthly account statements and their Millennium online account does not reflect any such monthly account statements. Thompson and Hewitt only recall receiving the annual account statements on Millennium's website.

102.    Plaintiffs were paid yields substantially below what they had been paid by Capital One, despite a rising 2022 and 2023 interest rate environment.

---

[10] https://perma.cc/A34S-AEQ3, https://perma.cc/48VQ-HS6X, https://perma.cc/83ZX-3K6D (last accessed June 10, 2024)

103.    During a period when interest rates were on the rise in tandem with increases to the federal funds rate, Millennium paid disproportionally low yields.  Beginning in March 2022, the federal funds target rate began to gradually rise from 0.00 – 0.25% to 0.25 - 0.50% on March 17, 2022 and ended 2022 at 4.25 - 4.50%.  As of January 12, 2024, the federal funds target rate was 5.25% - 5.50% and the effective federal funds rate as published by the Federal Reserve Bank of New York rate was 5.33%.  The federal funds target rate remained 5.25%-5.50% as of June 3, 2024.

104.    By contrast, the yields paid by Millennium concluded 2022 at 0.01%, and concluded 2023 at 0.08%.

105.    Despite the prevailing market trends of increased interest rates, Plaintiffs' interest rates at Millennium remained stagnant.

106.    Interest rates for online money market deposit accounts during the period March 2022 through the present were substantially higher than the yields paid by Millennium to Plaintiffs and other Class Members. And unlike the rates paid by Millennium, the rates paid by online banks reflected changes in the federal funds rate, reflecting the higher value of cash.

107.    Millennium's rates were not "based on the interest rate environment and competitive market conditions" compared to the rates paid by online banks.

108.    In addition to being paid a low yield, Plaintiffs were charged annual account maintenance and other fees by Millennium. These fees exceeded the total amount of interest earned on Plaintiffs' accounts.  In 2023, through April 24, 2023, Hewitt earned

only $3.06 in interest on the $15,000 he had deposited at Millennium, but was charged $45.00 in account fees.

109. Thompson was charged annual account maintenance and other fees by Millennium that she had not been charged by Capital One. The fees exceeded the total amount of interest earned on Thompson's account. In 2022, Thompson earned only $15.59 on the $100,592.09 she had deposited in her IRA account and was charged a $35.00 annual maintenance fee.

110. Effective for at least January 2024, Millennium (by then named Inspira) circulated an Automatic Rollover IRA Fee Schedule.

111. The January 2024 fee schedule stated that Millennium's "crediting rate is reviewed and revised periodically by Inspira and will exceed the national average of interest rates paid by FDIC-insured depositary institutions on savings or similar accounts for the applicable period, as published by the FDIC."

112. Plaintiffs, through internet research, have identified similar misrepresentations concerning the rates Inspira currently pays. *See, e.g.*, Inspira Financial Program Summary at page 2 ("Balances are initially invested in an FDIC-insured, interest-bearing bank demand account which offers a competitive interest rate for individuals seeking to minimize risk, preserve principal and maintain liquidity. The crediting rate is reviewed and revised periodically by Inspira Financial and will exceed the national average

of interest rates paid by FDIC-insured depository institutions on savings or similar accounts for the applicable period, as published by the FDIC.").[11]

113.    As of April 15, 2024, the average rate posted by the FDIC was 0.46%.  As of December 19, 2022, the average rate posted by the FDIC was 0.30%.  *See* https://www.fdic.gov/resources/bankers/national-rates/2022-12-19.html.  The rate Millennium paid investors is well below those posted rates. https://www.fdic.gov/resources/bankers/national-rates/index.html(last viewed June 5, 2024).

114.    In reliance on assurances received in connection with the account transfers, Hewitt and Thompson maintained their accounts with Millennium, not realizing that they were not being paid competitive rates.

115.    Once Plaintiffs realized they were not earning competitive rates, they transferred their accounts from Millennium.

116.    Other investors had similar experiences.  One investor on Reddit wrote, for example: "The transfer from Cap One to MT was a joke.  Paying 0.05% interest."[12]

**D.    Capital One Suffered From An Undisclosed Conflict of Interest**

117.    Upon information and belief, Capital One had an undisclosed financial interest in causing customer funds to be transferred to Millennium, and failed to disclose this conflict of interest to investors.

---

[11] https://trowepricerpssnc.cloud/overview/Inspira.pdf (last viewed June 5, 2024).

[12] https://www.reddit.com/r/personalfinance/comments/spb9mz/capital_one_gave_my_roth_ira_to_millennium_trust/ (Richardya; last viewed June 5, 2024).

118.    Capital One had total deposits of December 31, 2023 of $343.6 billion.  Upon information and belief, hundreds of millions of dollars, if not billions of dollars of those funds were maintained in IRA accounts that were transferred to Millennium.

119.     Millennium's financial interest in serving as custodian and managing IRA funds was substantial, and Millennium would have been willing to pay Capital One significant consideration to designate Millennium as successor custodian.

120.    Plaintiffs believe that their accounts were transferred to Millennium five months apart because of the large number of accounts that were required to be moved over.

121.    Capital One, as a for profit corporation, is not likely to have been willing to transfer the IRA accounts of Plaintiffs and other members of the Class without receiving consideration in return.

122.    The Plaintiffs' sweep assets were identified in their annual account statements with the designation "Interest Cash Sweep Account CapOne," indicating that Millennium sought to maintain balance information on the amount of cash that Capital One customers had transferred to Millennium.

123.    Upon information and belief, Capital One was compensated by Millennium based on the cash maintained in the Interest Cash Sweep Account CapOne.

124.    The most reasonable explanation for Capital One's transfer of the IRA accounts to a wholly deficient and inappropriate successor custodian like Millennium is that Capital One received valuable consideration for the transfer.

## CLASS ACTION ALLEGATIONS

125.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

126.    Plaintiffs seek to represent the following class ("the Class"): All persons in the United States who were owners of a Capital One IRA account transferred by Capital One to Millennium.

127.    Excluded from the class are Defendants Capital One, N.A., and Inspira, and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate during the course of this litigation.

128.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

129.    Numerosity – Federal Rule of Civil Procedure 23(a)(1).  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Capital One transferred at a minimum thousands of IRA accounts to Millennium.  While Plaintiffs are informed and believe that there are at least thousands of Class members, the precise number of Class members is currently unknown to Plaintiffs, but may be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice

dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

130. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.  whether Defendants engaged in the conduct alleged herein;

    b.  whether Defendants' alleged conduct violates applicable law;

    c.  whether Defendants failed to act in good faith for the benefit of Plaintiffs and the other Class members, acting instead on their own behalf;

    d.  whether Defendants made false statements in connection with the account transfers;

    e.  whether Defendants' conduct caused Plaintiffs and the other Class members to suffer a compensable loss;

    f.  whether Defendants' conduct alleged herein violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

    g.  whether Millennium's arbitration provisions are enforceable;

    h.  whether Plaintiffs and the other Class members are entitled to damages, restitution, equitable relief, statutory damages, exemplary damages, and/or other relief; and

    i.  the amount and nature of relief to be awarded to Plaintiffs and the other Class members.

131.     Typicality – Federal Rule of Civil Procedure 23(a)(3).  Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and each of the other Class members were depositors with Capital One, whose IRA accounts were transferred to Millennium.  Capital One failed to disclose to Plaintiffs and the Class that Millennium paid a significantly lower rate of interest than Capital One.   Plaintiffs and the other Class members suffered damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other class members.

132.     Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

133.     Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.   Among other things, Plaintiffs seek to enjoin Millennium from enforcing their compulsory arbitration agreement.

134.     Superiority – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct. Even if the Class members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT AGAINST DEFENDANT MILLENNIUM ON BEHALF OF PLAINTIFFS AND THE CLASS

135.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint including the facts alleged in Count II.

136.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") is a remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices.

137.    Pursuant to the ICFA, "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment,

suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' [815 ILCS 510/2] ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

138.    Under the ICFA, a "consumer" means "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  815 ILCS 505/1(e). "Merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services."  815 ILCS 505/1(b).  Under the ICFA, Plaintiffs and other members of the Class are "consumers," and the IRA accounts are "merchandise."

139.    The elements of a claim under the ICFA are that (1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury.

140.    The ICFA (815 ILCS 505/2) expressly incorporates the Federal Trade Commission Act (15 U.S.C. §§41-58) ("In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.").  The FTC has determined that "bait and switch sales practices," similar to those practiced by Capital One and Millennium

"are unfair and deceptive trade practices, and violate the FTC Act." https://www.ftc.gov/enforcement/penalty-offenses/bait-switch.

141. Among other things, Capital One had historically paid high yields on IRA cash savings. Plaintiffs and other members of the Class were caused to believe by Millennium (the "bait") that Capital One's business practice of paying high yields would continue after Millennium replaced Capital One as custodian. Plaintiffs and other members of the Class were not advised by Millennium that the practice of paying high yields would abruptly end after Millennium became successor custodian, and that Millennium would instead pay below market yields (the "switch").

142. Millennium also engaged in unfair and deceptive acts or practices when, among other things, it failed to adequately disclose that (1) unlike Capital One, Millennium was not a bank, and did not offer high yield cash savings products, did not directly invest the IRA cash of Plaintiffs and other members of the Class, or pay interest directly to Plaintiffs and other members of the Class; (2) Millennium would pay substantially lower yields on IRA cash savings as successor custodian than Capital One had paid as custodian; (3) Millennium charged additional annual and transaction fees that had not been charged at Capital One that would exceed the interest credited by Millennium to investors on an annual basis; and (4) unlike the Capital One IRA Agreement, the Millennium IRA Agreement contained an arbitration clause that was intended to preclude access to any forum to resolve claims by Plaintiffs and other members of the Class against Millennium.

143. Millennium also engaged in unfair and deceptive acts or practices when it represented to Plaintiffs and other members of the Class that yields would be "based on the

interest rate environment and competitive market conditions" and "exceeded the national average of interest rates paid by FDIC-insured depository institutions," but failed to disclose that after paying itself compensation Millennium paid substantially below market yields (lower than 0.10% APY) as so-called "interest" to Plaintiffs and other members of the Class.

144.    Millennium also engaged in unfair and deceptive acts or practices when it misrepresented in communications with Plaintiffs and other members of the Class that they would have a "wide array of investment choices" as Millennium customers, when in fact the default "investment" choice for IRA cash was Millennium's substantially below market Sweep Program; and Millennium did not offer a high-yield FDIC-insured savings account.

145.    The above unfair and deceptive acts or practices were reinforced by other Millennium communications lulling Plaintiffs and other members of the Class by promising (1) "You will have a trusted ally on your savings and investing journey," and (2) "[Y]ou'll gain a dedicated and caring team, backed by decades of experience to support your savings and investing journey."

146.    Millennium intended that Plaintiffs and other members of the Class rely on its unfair and deceptive acts or practices to induce them to transfer their IRA accounts from Capital One that paid high yields, to Millennium that paid substantially below market yields.

147.    The above unfair and deceptive acts or practices caused Plaintiffs to believe that Millennium would pay high yields on their IRA cash savings, when in fact Millennium

had no intention of doing so (and did not). Plaintiffs and other members of the Class were defaulted into IRA accounts at Millennium that paid so-called "interest" at rates substantially below what they had earned at Capital One and that were available at other comparable online banks and brokerage firms.

148.    The above unfair and deceptive acts or practices occurred in the course of trade or commerce because it involved the transfer and management of the IRA accounts of Plaintiffs and other members of the Class.

149.    The ICFA violations by Millennium proximately caused injury because Plaintiffs and the other members of the Class received substantially lower yields on their IRA cash savings than would have been paid by other successor custodians, including banks and brokerage firms.

## COUNT II

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANT MILLENNIUM ON BEHALF OF PLAINTIFFS AND THE CLASS

150.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint including the facts alleged in Count I.

151.    The Millennium IRA Agreement on the Millennium website at the time the IRA accounts were transferred stated that the funds of Plaintiffs and other members of the Class would be placed "in one or more" FDIC-insured, "interest-bearing [sweep] accounts ('Bank Accounts')."  Article IX; Para. 1; dated 01-22.

152.    The Millennium IRA Agreement also stated that "The Crediting Rate [used to calculate the yield actually paid to Plaintiffs and other members of the Class] is based on interest on the amounts held in the [sweep] Bank Accounts at each bank that participates in the [sweep] Program. The interest rate paid on each [sweep] Bank Account is set by each bank independently, based on the interest rate environment and competitive market conditions…." *Id.*

153.    The Millennium IRA Agreement went on to provide that "[Millennium] receives compensation for servicing and administering the Program and rendering other services in connection with custody of the Account." *Id*. Compensation was defined as "the difference between" the interest paid by the sweep Bank Accounts and the "net interest" paid to account owners "based on the Crediting Rate" set at the discretion of Millennium, but failed to disclose how the Crediting Rate was set and that almost the entire "competitive" rate paid by the [sweep] Bank Accounts would be taken by Millennium as "compensation," leaving Plaintiffs and other members of the Class with rates below 0.10% APY. *Id*.

154.    Under Illinois law, a covenant of good faith and fair dealing is implied by law in the Millennium IRA Agreement.

155.    The elements of a claim for breach of the covenant of good faith and fair dealing in Illinois are generally (1) the existence of a contractual relationship between the plaintiff and defendant; (2) plaintiff's performance (or excuse from performance) of its obligations under the contract; (3) that the defendant unfairly prevented the plaintiff from

35

receiving the benefits it was entitled to under the contract; and (4) injury to the plaintiff as a result of defendant's conduct.

156.    The purpose of the covenant of good faith and fair dealing is to ensure that one party does not take advantage of the other party in a way that will destroy the other party's justified expectations. Where one of the parties has discretion under the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with reasonable expectations.

157.    Millennium failed to exercise its discretion in good faith and fairly, consistent with the reasonable expectations that it would set the Crediting Rate and pay itself compensation so that the yields actually paid to Plaintiffs and other members of the Class were "based on the interest rate environment and competitive market conditions." For example, Capital One on its 360 Performance Savings Account and other comparable banks paid high yields based on competitive market conditions. In fact, the rate paid by Capital One prior to the account transfers was higher than the rate then being paid by Capital One on its 360 Savings Account. Instead, Millennium set the Crediting Rate so that the resulting yields actually paid to Plaintiffs and other members of the Class under the Millennium IRA Agreement was below 0.10% APY.

158.    The setting of the Crediting Rate and the compensation Millennium paid itself unfairly prevented Plaintiffs and other members of the Class from receiving the benefits they were entitled to under the Millennium IRA Agreement.

159. Plaintiffs and other members of the Class met their obligations under the Millennium IRA Agreement.

160. Millennium's breach of the covenant of good faith and fair dealing and the setting of the Crediting Rate and compensation Millennium paid itself damaged Plaintiffs and other members of the Class.

## COUNT III

### DECLARATORY JUDGMENT ON BEHALF OF PLAINTIFFS AND THE CLASS AVOIDING ARTICLE XXII OF THE IRA AGREEMENT CONCERNING BINDING ARBITRATION

161. Plaintiffs did not voluntarily agree to the IRA Agreement, but rather were coerced to agree to the Agreement, since agreement was the sole means to get access to the Capital One savings account that had been transferred to Millennium.

162. Correspondence from Millennium stated that if you want to "explore the wide array of investment choices available to you," prior to opening a Millennium IRA account, you need to "set up and log in as a 'New User,' which (on information and belief) includes consenting to the IRA agreement, including the arbitration clause."

163. Moreover, "[e]ven if you want to transfer your funds to another account … you will need to create an online account to verify your personal information."

164. Although the transfer to Millennium was involuntary, the only way for an investor to manage their account would require consent to the arbitration agreement.

165. Because Plaintiffs' consent to the arbitration clause was involuntary, the arbitration clause is unenforceable against them.

166.    Moreover, any contract, including a contract to arbitrate, can be avoided as against public policy.  A contract that contains an arbitration clause that as a practical matter precludes access to any forum for the purpose of resolving a claim is as a matter of law against public policy.

167.    Article XXII, subparagraph 1 of the IRA Agreement, entitled "Resolving Disputes and Binding Arbitration" purports to require that "any controversy, claim, counterclaim, cross claim, or other dispute arising out of or relating to the [IRA] Account or this [IRA] Agreement … must be settled by individual, confidential, binding arbitration before a sole arbitrator."

168.    Article XXII, subparagraph 3 mandates that "[t]he arbitration will be administered by Judicial Arbitration and Mediation Services ("JAMS") pursuant to its Comprehensive `Arbitration Rules and Procedures…."  Subparagraph 3 required that the "Account Owner" "acknowledge that the Account Owner is an investor, not a consumer, and this Agreement concerns investment transactions in an Account that are controlled by the Account Owner," and that "the parties specifically agree and acknowledge that the JAMS Consumer Arbitration Minimum Standards do not apply to any arbitration that arises from this Article.  This includes, but is not limited to, any provisions of the JAMS Consumer Arbitration Minimum Standards that allocate the costs and fees associated with the arbitration…."

169.    Article XXII, subparagraph 5 leaves no ambiguity that "[i]n the event of an arbitration, certain fees, expenses and costs will be required to be paid by the Account Owner based on the JAMS rules."

170.    Thompson's individual claim – measured by the rate paid on Capital One's 360 Performance Savings account compared to the rate paid by Millennium – is approximately $10,000 and Hewitt's claim is less than $1,000.  However, the JAMS filing fee for a commercial arbitration case is itself $2,000, and must be paid in full upon case filing to expedite the commencement of the proceedings.  Parties are also required to pay the mediator's hourly rate, plus a 13% Case Management Fee against all Professional Fees. In a consumer arbitration, the consumer is only required to pay $250.

171.    Although arbitration provisions in consumer contracts are frequently enforced, that is only when the consumer rules for arbitration apply, and not when commercial rules are applicable.

172.    According to public information, fees for JAMS mediators run from $400 to $1200 an hour depending on the mediator selected.[13]

173.    Requiring that Plaintiffs individually pay $2000 to file an arbitration plus hourly fees for a mediator would foreclose Plaintiffs and other class members from being able to pursue their claims, is unconscionable, and against public policy.

174.    JAMS' Comprehensive Arbitration Rules and Procedures[14], by its terms (Rule 1(a)), are designed to resolve claims that exceed $250,000, not consumer claims regarding interest paid on IRA accounts.

---

[13] https://getdispute.com/guide/what-is-jams-arbitration-and-how-does-it-work-2022-guide (last viewed June 5, 2024).

[14] https://www.jamsadr.com/rules-comprehensive-arbitration/#Rule-5 (last viewed June 5, 2024).

175.    Recognizing the significance of the class action mechanism to benefit investors, FINRA prohibits the use of arbitration agreements – in circumstances such as those here present -- to bar class actions.

176.    FINRA Rule 12204(d) prohibits member firms and associated persons from enforcing arbitration agreements against members of a certified or putative class action until certain events such as the denial of class certification occur.  Consistent with FINRA Rule 12204, FINRA Rule 2268(f) requires that all customer agreements include a statement that: "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court."

177.    Plaintiffs' IRA Agreements with Capital One did not have an arbitration provision. Plaintiffs were not prominently informed that by virtue of the designation of Millennium as successor custodian they would be bound by any arbitration clause.

178.    Those same principles should be applied here and bar Millennium's application of the arbitration case.

## COUNT IV

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANT CAPITAL ONE ON BEHALF OF PLAINTIFFS AND THE CLASS

179.    Plaintiffs re-allege and incorporate all other factual allegations set forth in this Complaint.

180.    The Capital One IRA Agreement with Plaintiffs and other members of the Class provided that Capital One has "the right to transfer your IRA assets to a successor IRA trustee or custodian that we choose in our sole discretion[.]" Section 8.09.

181.    Under Virginia law, a covenant of good faith and fair dealing is implied by law in the Capital One IRA Agreement.

182.    The elements for breach of the covenant of good faith and fair dealing in Virginia are generally (1) the existence of a contractual relationship between the plaintiff and defendant, (2) plaintiff's performance (or excuse from performance) of its obligations under the contract; (3) that the defendant unfairly prevented the plaintiff from receiving the benefits it was entitled to under the contract; and (4) injury to the plaintiff as a result of defendant's conduct.

183.    The purpose of the covenant of good faith and fair dealing is to ensure that one party does not take advantage of the other party in a way that will destroy the other party's justified expectations. Where one of the parties has discretion under the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with reasonable expectations.

184.    Capital One breached the covenant of good faith and fair dealing when it exercised its discretion to designate Millennium as successor custodian despite knowing, among other things, that (1) unlike Capital One, Millennium was not a bank, and did not offer high yield cash savings products, did not directly invest the IRA cash of Plaintiffs and other members of the Class, or pay interest directly to Plaintiffs and other members of the Class; (2) Millennium would pay substantially lower yields on IRA cash savings as successor custodian than Capital One had paid as custodian; (3) Millennium charged additional annual and transaction fees that had not been charged at Capital One that would exceed the interest credited by Millennium to investors on an annual basis; and (4) unlike the Capital One IRA Agreement, the Millennium IRA Agreement contained an arbitration clause that was intended to preclude access to any forum to resolve claims by Plaintiffs and other members of the Class against Millennium.

185.    The choice of Millennium was arbitrary, capricious, and inconsistent with the reasonable expectations of Plaintiffs and other members of the Class that Capital One would exercise its discretion to choose a successor custodian that would continue to pay the high yields Capital One had paid under the Capital One IRA Agreement, and that, in particular, Millennium as successor custodian would pay yields comparable with what Capital One had paid and that were available at other banks and brokerage firms qualified to serve as successor custodian.

186.    Capital One also failed to disclose whether and to what extent it received consideration from Millennium in return for Capital One's choice of Millennium as successor custodian, a material fact relevant to the motive of Capital One that Plaintiffs

and other members of the Class should have been told. By choosing Millennium as successor custodian, Capital One unfairly placed its interests ahead of Plaintiffs and other members of the Class.

187. The designation of Millennium as successor custodian unfairly prevented Plaintiffs and other members of the Class from receiving the benefits they were entitled to under the Capital One IRA Agreement.

188. Plaintiffs and other members of the Class met their obligations under the Capital One IRA Agreement.

189. Capital One's breach of the covenant of good faith and fair dealing and the choice of Millennium as successor custodian damaged Plaintiffs and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, request that the Court award the following relief:

1. Certifying this action as a class action, appointing Plaintiffs as the Class representatives and designating the undersigned as Class counsel;

2. Declare Defendants' conduct unlawful;

3. Enjoin enforcement on the arbitration clause in the Millennium IRA Agreement;

4. Enjoin Defendants from the unlawful conduct alleged herein, including by ordering Millennium to pay a variable, high-yield interest rate to owners of IRA accounts that were transferred to Millennium that is commensurate with comparable online banks.

5.      Award Plaintiffs and the Class damages under common law and/or by statutes, including treble and/or punitive damages;

6.      Award Plaintiffs and the Class restitution and/or disgorgement;

7.      Award Plaintiffs attorneys' fees, costs, and pre-judgment and post-judgment interest; and

8.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury on all issues so triable.


Dated:  June 11, 2024                      Respectfully submitted,

                                           ROBINSON CURLEY, P.C.


                                   By:     /s/ C. Philip Curley

                                           C. Philip Curley, Esq.
                                           ROBINSON CURLEY P.C.
                                           200 North LaSalle Street, Suite 1550
                                           Chicago, IL  60601
                                           Tel.: (312) 663-3100
                                           Fax: (312) 663-0303
                                           pcurley@robinsoncurley.com

                                           *Liaison Counsel for Plaintiffs*

OF COUNSEL:

Robert C. Finkel, Esq.
Philip M. Black, Esq.
Timothy D. Brennan, Esq.
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Tel.: (212) 759-4600
Fax: (212) 486-2093
rfinkel@wolfpopper.com
pblack@wolfpopper.com
tbrennan@wolfpopper.com

*Lead Counsel for Plaintiffs*