UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL HEWITT and | ) | |
| LYNNE THOMPSON, individually | ) | |
| and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | No. 1:24-CV-04839 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CAPITAL ONE, N.A., and | ) | |
| INSPIRA FINANCIAL TRUST LLC, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Daniel Hewitt and Lynne Thompson had individual retirement accounts (IRAs) with Capital One. R. 1, Compl. ¶¶ 15, 16.[1] But then Capital One informed them that the bank would be resigning as their IRA custodian and that if they did not transfer their IRAs elsewhere, Capital One would hand over their IRAs to Millennium Trust (which is owned by Inspira Financial Trust). *Id.* ¶¶ 15, 16, 44. Hewitt and Thompson did not instruct otherwise, so Millennium took over as the successor custodian of their IRAs. *See id.* ¶ 50. Millennium then told Hewitt and Thompson that unless they provided instructions to invest their money in different investment options, it would be placed in the Millennium cash-sweep program. *See id.* ¶¶ 50, 68. Again, Thompson and Hewitt did not act, so their money went into the cash sweep

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

program, where it began accruing about a 0.02% interest rate. *Id.* ¶¶ 50, 93. That interest rate was much lower than the 0.40% rate that their IRAs had earned at Capital One. *Id.* ¶¶ 92–94.

Based on this difference in interest rates, Hewitt and Thompson brought this lawsuit.[2] Compl. They allege that both Capital One and Millennium violated the implied covenant of good faith and fair dealing, and they also allege that Millennium violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505. *Id.* at 30–43. Finally, the Plaintiffs seek a declaratory judgment that the claims against Millennium should not go to arbitration. *Id.* at 37–40.

Capital One now moves to dismiss, arguing that Hewitt and Thompson failed to adequately state an implied-covenant claim. R. 21, Capital One Mot. For its part, Millennium moves to compel arbitration of the two claims against it, and in the alternative, also moves to dismiss for failure to state a claim. R. 24, Millennium Mot. Capital is correct that the Plaintiffs have failed to state a claim, though they will have a chance to amend the complaint. And the claims against Millennium must be arbitrated. So Capital One's motion to dismiss is granted, and Millennium's motion to compel arbitration is also granted.

---

[2]The Court has diversity jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed class would cover thousands of members, there is minimal diversity of citizenship, and the aggregate amount in controversy exceeds $5 million.

# I. Background

The Court accepts all well-pleaded factual allegations in the Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In January 2016, Daniel Hewitt and Lynne Thompson opened IRAs with Capital One. Compl. ¶¶ 15, 16. When opening these accounts, Hewitt and Thompson agreed to be bound by Capital One's Individual Retirement Custodial Account Agreement (for convenience's sake, the Capital One IRA Agreement). *Id.* ¶¶ 42, 180.

Most relevantly, that agreement, rather than promise a specific interest rate, stated that the "Interest Rate and APY may change. At [Capital One's] discretion, [it] may change the Interest Rate for [the] account at any time." R. 22-2, Capital One IRA Account Disclosures at 19. The agreement also provided that Capital One would "not be responsible for losses of any kind that may result from [the account holder's] directions, actions, or failures to act." R. 22-1, Capital One IRA Agreement § 8.03. Next, the Capital One IRA Agreement explained the process by which Capital One could resign as the custodian of Hewitt and Thompson's accounts. The agreement warned that the successor IRA custodian would take custody of the IRA assets if the account owners did not otherwise transfer the assets:

> We can resign as custodian at any time effective 30 days after we send written notice of our resignation to you. Upon receipt of that notice, you must make arrangements to transfer your IRA to another financial organization. If you do not complete a transfer of your IRA within 30 days from the date we send the notice to you, we have *the right to transfer your IRA assets to a successor IRA trustee or custodian* that we choose in our sole discretion ….

3

*Id.* § 8.09 (emphasis added). The successor-custodian provision also set forth a disclaimer of liability that would let Capital One off the hook for anything the successor did or failed to do:

> We will not be liable for any actions or failures to act on the part of any successor trustee or custodian ....

*Id.*

On April 13, 2022, Capital One sent Hewitt a written notice of its intent to resign as IRA custodian, effective two months later, on June 13. Compl. ¶¶ 43–44, 65. That notice informed Hewitt that unless he decided otherwise, his IRA would be transferred to Millennium Trust, which would serve as the successor custodian. *Id.* ¶ 44; R. 22-3, Resignation Notice at 2 (PDF page number). It went on to explain that Hewitt's money would initially be invested in Millennium's "cash sweep program." Resignation Notice at 2 (PDF page number). The notice included a link to Millennium's website and explained that the website contained more information about the company and about investment options and contained a copy of the new agreement (Millennium IRA Agreement) that would govern Hewitt's IRA going forward. *Id.* Finally, the notice told Hewitt what to do if he did not want his account to be transferred to Millennium, did not want his money invested in the cash sweep program, or did not agree to Millennium's custodial agreement. *Id.* at 3 (PDF page number). To avoid those things, Hewitt had till May 27, 2022, to follow the steps provided in the notice to transfer his IRA to another financial institution or to cash out his IRA. *Id.* The other plaintiff, Thompson, also received a copy of the same written resignation notice,

informing her that her account would be transferred to Millennium if she took no action. Compl. ¶ 43.

After getting these notices, neither Hewitt nor Thompson took any action to transfer or cash out their IRAs before the provided deadline. *See id.* ¶ 50. So Capital One transferred their IRAs to Millennium, which then invested their money in the cash sweep program. *Id.* In the lead up to these account transfers, Millennium sent several emails to Hewitt and Thompson, reminding them that unless they chose to transfer their accounts to a different financial institution by the provided deadline, Millennium would serve as the successor custodian for their IRAs. R. 25-2, Smith Decl. ¶¶ 6–9. The emails all included a link to the Millennium IRA Agreement, which would govern Hewitt and Thompson's accounts going forward. *Id.* As important here, that agreement provided that the money in their accounts would be initially invested in Millennium's cash sweep program and would remain there unless and until Hewitt and Thompson directed Millennium to invest their money in another investment option. R. 25-3, Millennium IRA Agreement at 4 (PDF page number). The Millennium IRA Agreement also explained that under the cash sweep program, the account holder's money would be invested in third-party bank accounts, and those banks would independently set interest rates, which would vary over time. *Id.* Finally, the agreement included an arbitration provision that stated that any dispute arising out of the agreement or relating to an account holder's IRA would be resolved through arbitration. *Id.* at 9 (PDF page number).

5

Once Hewitt and Thompson's IRAs were transferred to Millennium, they set up their online account portals on Millennium's website. Smith Decl. ¶¶ 24, 25. As part of that setup process, they both repeatedly clicked an acknowledgment box in the portal, attesting that they had "reviewed and agreed to the Custodial Agreement that governs [their] account[s]." *Id.* ¶¶ 26, 27; R. 25-23, Millennium Terms and Conditions at 7 (PDF page number). And despite receiving several emails from Millennium reminding them that their money was invested in the cash sweep program and that they could transfer their money to the many other investment options available to them, Hewitt and Thompson took no action, leaving their money in the cash sweep program. Compl. ¶¶ 50, 68; Smith Decl. at 5–9. But then after a few months, Hewitt and Thompson noticed that they were getting a low rate of interest. Compl. ¶¶ 96, 97. Whereas they were receiving a 0.40% annual percentage yield with Capital One, Millennium's cash sweep program paid them only a 0.02% yield. *Id.* ¶¶ 92–94.

Based on this stark difference in interest rates, Hewitt and Thompson brought this proposed class action lawsuit. Compl. They allege that Millennium violated the Illinois Fraud Act and breached the covenant of good faith and fair dealing. *Id.* at 30–37. They also seek a declaratory judgment to avoid binding arbitration of their dispute with Millennium. *Id.* at 37–40. Finally, the Plaintiffs bring a claim against Capital One, also for violating the covenant of good faith and fair dealing. *Id.* at 41–43. Capital One now moves to dismiss the implied-covenant claim, arguing that Hewitt and Thompson fail to state a claim for relief. Capital One Mot. And Millennium moves to compel arbitration, contending that the two claims against them should be

submitted to binding arbitration under the custodial agreement. Millennium Mot. Millennium also argues in the alternative that if arbitration is not required, then the claims against it should be dismissed for failure to state a claim. *Id.*

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

The Federal Arbitration Act, which applies to a "written provision ... evidencing a transaction involving commerce," 9 U.S.C. § 2, governs whether a motion to compel arbitration should be granted. Under the Act, an arbitration agreement "arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id*. "Although it is often said that there is a federal policy in favor of arbitration, federal law places arbitration clauses on equal footing with other contracts, not above them." *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (citing *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010)).

If the parties have a valid arbitration agreement and the asserted claims in a lawsuit are within its scope, then the arbitration requirement must be enforced. 9 U.S.C. §§ 3–4; *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir.2004). Whether a binding arbitration agreement exists is determined under principles of state contract law. *Janiga*, 615 F.3d at 742. The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. 9 U.S.C. § 4; *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). At the same time, however, the party that is resisting arbitration bears the burden of identifying a triable issue of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The opponent's evidentiary burden is akin to that of a party opposing summary judgment under Federal Rule of Civil Procedure 56. *Id.* "[A] party

cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* Just like at the summary judgment stage, the Court must view the evidence in the light most favorable to the non-movant (that is, the party opposing arbitration) and draw reasonable inferences in the non-movant's favor. *Id.* If the party opposing arbitration identifies a genuine issue of fact as to whether an arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *see Tinder*, 305 F.3d at 735.

### III. Analysis

### A. Capital One

Capital One argues that Hewitt and Thompson have failed to adequately state a claim for breach of the implied covenant of good faith and fair dealing. R. 22, Capital One Mem. at 9. That is correct: the Plaintiffs fail to adequately allege that Capital One breached the implied covenant.

First, the parties clash as to what state's law governs their dispute. Capital One argues that Delaware law applies, but Hewitt and Thompson claim that Virginia law governs. Capital One's position is the right one. Because the Court sits in diversity here, it must apply the forum state's (Illinois's) choice-of-law principles. *See Wells Fargo Bank N.A. v. Morgan*, 2016 WL 3958858, at *2 n.2 (N.D. Ill. July 22, 2016). And "Illinois courts respect a [contractual] choice-of-law clause where the contract is valid, and the law chosen is not contrary to Illinois public policy." *Id.* Here, there is a valid choice-of-law clause. The Capital One IRA Agreement states that Hewitt and

9

Thompson's "accounts are subject to Federal law and Delaware state law." Capital One IRA Account Disclosures at 9 (PDF page number). So that choice-of-law provision governs, and Delaware state law thus applies to resolve this dispute.

Next, Capital One contends that certain liability limitations in its IRA agreement foreclose Hewitt and Thompson's implied-covenant claim. Capital One Mem. at 10–13. That is true and dooms the Plaintiffs' claim. The Complaint alleges that Capital One violated the covenant of good faith and fair dealing by choosing Millennium as the successor custodian for the Plaintiffs' IRAs, despite knowing that Millennium would pay lower interest rates than Capital One had been paying. Compl. ¶ 184. But Capital One correctly points out that its custodial agreement—which Hewitt and Thompson agreed to—states that Capital One would "not be liable for any actions or failures to act on the part of any successor … custodian." Capital One IRA Agreement § 8.09. That means that Capital One is not liable for the failure by Millennium to pay a higher interest rate on Hewitt and Thompson's accounts.

This kind of a liability-limiting contract provision is permissible under Delaware state law. As Delaware courts have explained, "[w]ith respect to limitations on contractual liability, freedom of contract would suggest that parties to a contract should be entitled to draft agreements so as to avoid certain of the duties and liabilities that are normally part of a contractual relationship." *eCommerce Indus., Inc. v. MWA Intel., Inc.,* 2013 WL 5621678, at *45 (Del. Ch. Sept. 30, 2013). So § 8.09 of the Capital One IRA Agreement is enforceable and bars Hewitt and Thompson's implied-

10

covenant claim by limiting Capital One's liability for Millennium's actions and omissions.

But Hewitt and Thompson contend that § 8.09 does not preclude their claim because the implied-covenant claim focuses on *Capital One*'s actions, not on Millennium's actions. R. 41, Pls.' Resp. Br. at 43. Specifically, the Plaintiffs argue that their claim centers on the allegation that Capital One abused its discretion by choosing Millennium as the successor custodian. *Id.* Thus, the liability-limiting provision would not apply to the implied-covenant claim. *Id.*

That is not right. The core of the implied-covenant claim is that Capital One should be liable for choosing Millennium as the successor custodian *because Millennium paid low interest rates*. Compl. at 42. As Capital One correctly notes, if Millennium had paid a comparable or higher interest rate to Capital One, then the Plaintiffs would have no claim at all against Capital One. So although the Plaintiffs try to present the claim as being entirely based on Capital One's actions, the implied-covenant claim seeks to hold Capital One liable for damages caused by *Millennium*'s actions or failures to act. Section 8.09's language thus squarely applies and forecloses liability for Millennium's alleged shortcomings. Hewitt and Thompson fail to adequately state a claim for Capital One's breach of the covenant of good faith and fair dealing. Capital One's motion to dismiss is granted. Having said that, because the Plaintiffs have not yet had a chance to amend their Complaint, the dismissal is without prejudice for now. If the Plaintiffs believe that they can somehow fix the flaw, then they must file the amended complaint by April 16, 2025.

11

## B. Arbitration with Millennium

Millennium contends that the Plaintiffs' two claims against it must be submitted to binding arbitration rather than be decided by the Court. R. 25, Millennium Mot. Mem. at 9. Hewitt and Thompson, in response, seek a declaratory judgment that arbitration is not required here. Compl. at 37–40. Millennium is right: the claims must go to arbitration. "Under the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, (7th Cir. 2005). All three elements are met here.

Hewitt and Thompson first argue that there is no valid, written arbitration agreement because they neither received reasonable notice of the agreement nor voluntary consented to be governed by it. Compl. at 37. Both of those contentions miss their marks. Even with the benefit of reasonable inferences in their favor, the Plaintiffs consented to being governed by the Millennium IRA agreement. When setting up their online account portals, Hewitt and Thompson clicked on an acknowledgment box multiple times that stated that they agreed to Millennium's terms and conditions. Smith Decl. ¶¶ 26, 27. Part of those terms and conditions was an affirmation that the account holder "ha[d] reviewed and agreed to the Custodial Agreement that governs [their] Millennium Trust account." Millennium Terms and Conditions at 7 (PDF page number). So the Plaintiffs repeatedly affirmed that they had read and agreed to the terms of the Millennium IRA Agreement, which included an arbitration provision.

12

And these affirmations qualify as assent to the agreement even if Hewitt and Thompson did not actually read the terms and conditions or the Millennium IRA Agreement. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997).

But Hewitt and Thompson counter that the arbitration agreement still does not apply because the agreement was buried in fine print and because they did not get reasonable notice of the arbitration provision. Pls.' Resp. Br. at 6–7. Even when the evidence is viewed in their favor, that response falls short. Millennium sent numerous emails to Hewitt and Thompson in the lead up to, and after, their IRAs were transferred from Capital One. Smith Decl. ¶¶ 6–9. In each of those emails, there was a hyperlink to the Millennium IRA Agreement. *Id.* So the Plaintiffs had repeated notice of the agreement that would apply to their IRAs going forward, and thus they had repeated notice of the arbitration provision in that agreement. Also, more than a month before the IRA transfer, Capital One informed Hewitt and Thompson that the Millennium IRA Agreement would govern their accounts after the transfer, and Capital One provided a link to Millennium's website so that the Plaintiffs could review that agreement. Resignation Notice at 2 (PDF page number). Plus, once again, the Plaintiffs affirmed multiple times—by agreeing to Millennium's terms and conditions—that they had read the Millennium IRA Agreement. Smith Decl. ¶¶ 26, 27. Under Illinois law, an agreement is enforceable "even if a user does not choose to visit the hyperlink or read through the terms of the agreement." *Ambrosius v. Chicago Athletic Clubs, LLC*, 203 N.E. 3d 239, 247 (Ill. App. 2021). Nor was the arbitration provision sneakily presented in tiny-size print or otherwise difficult to locate: the

13

Plaintiffs knew that their accounts were being transferred to Millennium and that the Millennium IRA Agreement would control their relationship. So the notice of the arbitration agreement was sufficient, and the Plaintiffs' multiple affirmations that they agreed to be governed by the Millennium IRA Agreement were binding. There is a valid, enforceable written arbitration agreement between Millennium and the Plaintiffs.

Next, Hewitt and Thompson argue that even if they agreed to the arbitration agreement, the agreement is unenforceable because it is unconscionable. Pls.' Resp. Br. at 12. That is not so. The Plaintiffs begin by contending that the arbitration agreement is unconscionable because it bars class-action arbitration and because the fees that the Plaintiffs would need to individually pay would be too expensive. Compl. at 38–40. But the Supreme Court has generally rejected this argument. A class-action waiver in an arbitration agreement is enforceable even if class-action arbitration is the only avenue "worth the expense involved in proving" a claim and even if the "existence of large arbitration costs could preclude a litigant … from effectively vindicating" his rights. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236–38 (2013) (cleaned up). Nor do the Plaintiffs offer any evidence that they themselves cannot afford to pursue even an individual arbitration. This is not a proposed class action for individual consumers who might find individual filing fees prohibitive, no matter the potential recovery. Thus, here, the arbitration agreement's class-action waiver and individual fees do not preclude its enforceability.

14

The Plaintiffs also assert that the arbitration provision is unenforceable because Millennium "holds itself out as having the characteristics of a broker-dealer" and financial rules "forbid broker-dealers from including class action waivers." Pls.' Resp. Br. at 10–11. But the evidence (even viewed in the Plaintiffs' favor) shows that Millennium does *not* hold itself out as a broker-dealer. To the contrary, the Millennium IRA Agreement expressly says that Millennium "provides services in the capacity of a directed custodian and is not a fiduciary." Millennium IRA Agreement at 2 (PDF page number). So the Plaintiffs were made aware that they would *not* get the same kinds of protections from Millennium that they would from a broker-dealer. And again, the Plaintiffs still chose not to transfer their IRAs to a different financial institution. Compl. ¶ 50, 68. The Plaintiffs' argument is rejected.

Hewitt and Thompson then claim that the agreement is unconscionable because of its prohibitions on punitive damages and appeals. Pls.' Resp. Br. at 15. Yet these differences between arbitration and normal court proceedings are not enough to render the arbitration provision unenforceable. *See Hawkins v. Aid Ass'n for Lutherans,* 338 F.3d 801, 807 (7th Cir. 2003); *O'Quinn v. Comcast Corp.*, 2010 WL 4932665, at *7 (N.D. Ill. Nov. 29, 2010). Thus, all of the Plaintiffs attempts to cast doubt on the validity and enforceability of the arbitration agreement fail.

Finally, the claims at issue fall well within the bounds of the arbitration agreement, satisfying the final element of what is required to compel arbitration. The Millennium IRA Agreement requires arbitration of any dispute "arising out of or relating to" Hewitt and Thompson's IRAs or the IRA Agreement itself. Millennium IRA

Agreement at 9 (PDF page number). Hewitt and Thompson's claims center on their assertion that Millennium paid an insufficient interest rate on their IRAs, so the claims clearly relate to the Plaintiff's IRAs and the terms governing them. *See* Compl. at 30–37. Given that the claims fall within the scope of the arbitration provision and that there is a valid, written arbitration agreement, the motion to compel arbitration is granted. The claims against Millennium shall thus be resolved through individual, binding arbitration, and the matter is stayed pending that arbitration.

### IV. Conclusion

Capital One's motion to dismiss, R. 21, is granted, though the claims are dismissed without prejudice for now. The Plaintiffs may file an amended complaint by April 16, 2025, if they believe that they can fix the problems. Millennium's motion to compel arbitration, R. 24, is granted. The Plaintiffs' claims against Millennium are referred to arbitration, and the case is stayed as to Millennium. The parties shall file a status report on April 18, 2025.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2025